**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 15, 2013**

# In the Court of Appeals of Georgia

A12A2560. NEILL v. BRANNON.

ELLINGTON, Chief Judge.

Kelly Neill, the mother of seven-year-old C. B. N., appeals from the trial court's grant of the legitimation petition filed by the girl's biological father, Charles Brannon. Neill contends that the court erred in failing to expressly rule upon whether Brannon had abandoned his opportunity interest in establishing a parent-child relationship with C. B. N. and whether legitimation was in the child's best interest. She also argues that there was insufficient evidence to support the court's judgment. For the following reasons, we reverse the court's grant of Brannon's legitimation

petition, and, as a result, the grant of visitation rights to Brannon is vacated as a matter of law.[1]

1. Neill contends that the trial court committed reversible error when it granted Brannon's legitimation petition without expressly determining, as a threshold matter, whether Brannon had abandoned his opportunity interest in establishing a parent-child relationship with C. B. N. We agree.

"In considering a legitimation petition, the court must initially determine whether the father has abandoned his opportunity interest to develop a relationship with the child." (Citation and punctuation omitted.) *In the Interest of M. K.*, 288 Ga. App. 71, 74 (2) (653 SE2d 354) (2007).

> As our Supreme Court has found, a biological father is afforded an opportunity to develop a relationship with his offspring. If the father grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. Unwed fathers gain from their biological connection with a child an opportunity interest to develop a relationship with their children which is constitutionally protected. This opportunity interest

---

[1] See Division 3, infra. Notably, the trial court ruled that, if the mother appealed the legitimation order, its order granting Brannon's request for visitation would be stayed pending the outcome of the appeal.

2

begins at conception and endures probably throughout the minority of the child. But it is not indestructible. It may be lost. It is an interest which can be abandoned by the unwed father if not timely pursued.

(Punctuation and footnotes omitted.) *Binns v. Fairnot*, 292 Ga. App. 336, 338 (665 SE2d 36) (2008). "Factors which may support a finding of abandonment include, without limitation, a biological father's inaction during pregnancy and at birth, a delay in filing a legitimation petition, and a lack of contact with the child." (Footnotes omitted.) *Morris v. Morris*, 309 Ga. App. 387, 389 (2) (710 SE2d 601) (2011). If the evidence supports a finding that a father has abandoned his opportunity interest in developing a relationship with his biological child, then the court is authorized to end its inquiry and to deny the legitimation petition on that basis. *In the Interest of J. S.*, 302 Ga. App. 342, 344 (1) (691 SE2d 250) (2010).

"We review a trial court's ruling on a legitimation petition for abuse of discretion." (Footnote omitted.) *Binns v. Fairnot*, 292 Ga. App. at 337. We review the court's factual findings, however, for clear error and will only sustain such findings if there is competent evidence to support them. *Matthews v. Dukes*, 314 Ga. App. 782, 786 (1) (726 SE2d 95) (2012), overruled on other grounds, *Brine v. Shipp*, 291 Ga. 376, 380 (3) (729 SE2d 393) (2012).

In this case, the record shows the following undisputed, relevant facts on the issue of whether Brannon abandoned his opportunity interest. Sometime prior to 2005, Brannon met Neill at a friend's house, and they began a sexual relationship. During that period, Brannon was "dealing in methamphetamine," and both he and Neill were abusing the drug. When Neill told Brannon she was pregnant, Brannon asked her if he was the father, and she told him no. Neill's daughter, C. B. N., was born in September 2005. At some point within the next year, a DNA test revealed that Brannon was, in fact, the child's biological father. Based upon those results, Neill filed a paternity action seeking child support, and, in December 2006, the Superior Court of Dawson County ordered Brannon to begin paying $40 a week in child support. By February 2008, however, Brannon was $792 in arrears in his support payments, and Neill filed a child abandonment petition. Neill withdrew the petition when Brannon resumed his payments.

In March 2008, Brannon was arrested for felony possession of methamphetamine and Darvocet.[2] He was convicted and incarcerated for six months;

---

[2] See OCGA §§ 16-13-30 (a), (e) (g) (felony possession of controlled substances); 16-13-26 (3) (B) (methamphetamine is a Schedule II controlled substance); 16-13-28 (a) (30.05) (propoxyphene, the active component of the pain-relief medicine Darvocet, is a Schedule IV controlled substance).

4

he then spent twelve months in a residential drug rehabilitation program, followed by a six-month outpatient program. In February 2011, about a year after completing the programs, Brannon filed the instant legitimation petition; at that time, C. B. N. was five and a half years old.

Neill objected to the legitimation petition, asserting that Brannon had failed to visit, contact, or make any other meaningful attempt to establish a relationship with C. B. N. since her birth and had failed to provide court-ordered child support on a consistent basis. She contended that Brannon had therefore abandoned his opportunity interest in establishing a parent-child relationship with C. B. N., and, consequently, the court should deny his legitimation petition. She also asserted that, even if Brannon had not abandoned his opportunity interest, the court should deny his petition because he is not a fit parent and legitimation would not be in C. B. N.'s best interest, citing his history of domestic violence, numerous DUI and other convictions, and felony drug possession convictions.

During the hearing on the legitimation petition, Brannon admitted that, during the years between when he learned that he was C. B. N.'s biological father in 2006 and November 2010, when he had triple bypass heart surgery, he never spoke to C.

B. N., visited her, or sent her cards or presents,[3] nor did he file a legitimation petition.[4] Although Brannon claimed that he did not know Neill's address during that time period,[5] he admitted that he learned Neill's mailing address in 2008, when she filed the child abandonment petition. Further, Brannon admitted that he had known the address of Neill's parents since at least 2006, yet he never tried to contact Neill

---

[3] On this issue, Brannon testified that he, his adult daughter, and some of his grandchildren sent birthday cards to C. B. N. at Neill's parents' address, but Neill returned them to him unopened. The record shows, however, that all of the cards were sent in September 2011, which was several months *after* Neill objected to his legitimation petition on the basis of his abandonment of his opportunity interest.

[4] During his deposition, Brannon explained that, before his heart surgery, he was trying to get his life "straightened out" and had no money to spend on efforts to contact C. B. N. or to file a legitimation petition.

[5] According to Neill, she did not attempt to maintain contact with Brannon after 2006 because he had been physically abusive and she was frightened of him and because she believed that he was still abusing drugs. Brannon admitted that, as part of his residential drug rehabilitation program, he participated in anger management counseling.

or C. B. N. at that address.[6] In addition, the record shows that Brannon was $618 in arrears in his child support payments at the time of the February 2012 hearing.[7]

In an attempt to explain his lack of effort toward developing a relationship with C. B. N., Brannon testified that he had been in contact with Neill sometime in 2007 and had arranged to meet with her and the child, but he missed the meeting. According to Brannon, Neill then told him that he had missed his only chance to see C. B. N. Brannon also admitted that he made no efforts to contact Neill during the 18 months he was incarcerated and in the residential rehabilitation program following his 2008 arrest. In fact, he testified that he only started looking for Neill sometime in 2010, when he was preparing to file the legitimation petition. In addition, Brannon testified that he had never tried to contact Neill at her parents' house because he had gone to their home one time on an unrelated errand and Neill's father had told him

---

[6] According to Neill, she was living with her parents at the time C. B. N. was born in 2005, and she and C. B. N. lived there until 2010, with the exception of a nine month period between June 2007 and March 2008. In 2010, they moved into an apartment with Neill's boyfriend, Richard Evans; Neill and Evans married in December 2011.

[7] During his deposition, Brannon testified that the arrearage accrued while he was incarcerated following his March 2008 arrest and that he had been paying toward the arrearage ever since. The record shows, however, that Brannon was already $792 in arrears *before* his March 2008 arrest.

to leave Neill alone or he would have a "fatal accident."[8] Brannon failed to testify as to when this incident occurred, however, so there is no evidence to show whether it happened before or after C. B. N. was born.

Although the juvenile court judge in this case made no express findings in its written order as to whether Brannon abandoned his opportunity interest in establishing a relationship with C. B. N., he suggested during the hearing that he believed Brannon's failure to establish a relationship with C. B. N. was partly caused by Neill's statements to him, his "trouble finding" Neill, her return of the birthday cards he sent to C. B. N. in September 2011, and her father's threatening statement to Brannon. The judge stated that "I think there was a real problem in trying to communicate, even if [Brannon] had wanted to [communicate] with the child."

As shown above, however, Brannon admitted that he had addresses for Neill and/or her parents since at least 2006, yet never tried to contact her or C. B. N. at

---

[8] Notably, this testimony contradicts Brannon's deposition testimony about the alleged threat by Neill's father. During his deposition, he testified that he never talked to Neill's father at the latter's home, but that, during a phone call between his (Brannon's) daughter and Neill's father, the latter had "apparently" threatened to kill him. That testimony was hearsay, however, as Brannon was not a party to the phone conversation and, thus, did not personally hear the alleged threat. We also note that Brannon did not mention the alleged direct, "fatal accident" threat at any point during his deposition.

those addresses. In addition, he admitted that he made no attempt to find an alternate address for Neill or to initiate legitimation proceedings until the fall of 2010, when C. B. N. was already five years old. Although Brannon suggested that he was unable to contact Neill while he was incarcerated and in residential drug rehabilitation for 18 months, "Georgia law is well settled that [Brannon] cannot object to the natural consequences brought about by his own voluntary commission of criminal acts." (Citation omitted.) *Turner v. Wright*, 217 Ga. App. 368, 369 (1) (457 SE2d 575) (1995). As for Neill's father's threat, there was no evidence to show when it occurred; it follows that, until the threat was actually made, it could not have prevented Brannon from contacting Neill at her parents' home. Further, the birthday cards for C. B. N.'s sixth birthday that Brannon sent to Neill's parents' address in September 2011 were the *only* cards or letters he had *ever* sent to C. B. N., and, by that time, Neill had already challenged his legitimation petition on the basis of his having abandoned his opportunity interest, as well as his lack of parental fitness.

Given these circumstances, we conclude that, even if Neill and/or her family had attempted to discourage Brannon from contacting her or C. B. N. from 2006 through 2010, the trial court erred to the extent it found that those efforts were the primary cause of Brannon's failure to pursue a parent-child relationship with the

9

child. Instead, by his own admission, Brannon waited until after his heart surgery in November 2010 – more than *four years* after conclusively learning that C. B. N. was his biological daughter – before *even deciding* that he would like to have a parent-child relationship with her and filing his legitimation petition.

Moreover, there is no evidence that *any* actions by Neill or her family prevented him from filing a legitimation petition at any point before 2011. In fact, even though Brannon did not learn that he was definitely the child's father until the child was one year old, he was aware of the possibility that he could be the biological father before the child was born and, to remove any doubts, he could have filed a legitimation petition right after her birth and sought court-ordered genetic testing. *In the Interest of J. L. E.*, 281 Ga. App. 805, 806-807 (637 SE2d 446) (2006) (obtaining the results of genetic testing is not a condition precedent to filing a legitimation petition under OCGA § 19-7-22); see OCGA §§ 19-7-43 (d); 19-7-45.

Consequently, we conclude that the undisputed evidence establishes that Brannon abandoned his opportunity interest in a parent-child relationship with C. B. N. It follows that the trial court's grant of Brannon's legitimation petition must be reversed. See *Matthews v. Dukes*, 314 Ga. App. at 783-787 (1) (A child was conceived during an extramarital affair between the biological father and the child's

10

mother. Although DNA tests confirmed the child's parentage and the father provided some financial support and had sporadic visits with the child, the father waited five years before filing a legitimation petition. This evidence showed that the father had abandoned his opportunity interest and supported the denial of his legitimation petition.).[9]

---

[9] See also *In the Interest of J. S.*, 302 Ga. App. at 344 (1) (Although the biological father had lived with and financially supported his child and the child's mother for a year after the child was born, he had no significant contact with the child and failed to pay child support for the next four years, while he was incarcerated for felony theft by taking. This evidence showed that the father had abandoned his opportunity interest and supported the denial of his legitimation petition.); *In the Interest of J. L. E.*, 281 Ga. App. 805, 806-807 (637 SE2d 446) (2006) (A child born to unwed parents was placed in the state's custody when the child was six months old. The biological father visited the child twice over the next four months, then was arrested on a probation violation and incarcerated. Eight months after his arrest, and four months after the state filed a petition to terminate his parental rights, the father filed a legitimation petition. This evidence showed that the father had abandoned his opportunity interest and supported the denial of his legitimation petition.); *Smith v. Soligan*, 254 Ga. App. 172, 173-174 (2) (561 SE2d 850) (2002) (Although the biological father had lived with the child and the child's mother until the child was four years old, for the next two years, the father had only a few contacts with the child and did not provide any child support. Only after the mother married and her husband filed an adoption petition did the father file a legitimation petition. This evidence showed that the father had abandoned his opportunity interest and supported the denial of his legitimation petition.); *In the Interest of D. S. P.*, 233 Ga. App. 346, 346-349 (2) (504 SE2d 211) (1998) (Concerned that he may not be the biological father of his girlfriend's two-month-old child, the father insisted on a DNA test, which confirmed that the child was his. While the child's parentage was in doubt, the father failed to maintain contact with the mother or provide any financial or emotional support for her, and, despite knowing that the mother intended to place the child for

2. Neill also contends that, even if Brannon had not abandoned his opportunity interest in developing a relationship with C. B. N., the trial court still erred in granting the legitimation petition because there was no evidence that legitimation was in the child's best interest. We agree.

If the evidence does not show that the father has abandoned his opportunity interest, then the court may grant the legitimation petition if the evidence shows either that the father is a fit parent[10] or that legitimation is in the best interest of the child. *In the Interest of M. K.*, 288 Ga. App. at 74 (2). In determining whether legitimation is in the best interest of the child, "the court must examine the benefits that might flow to the child if she were legitimated and . . . consider the legal consequences of the grant of the petition." (Citation and punctuation omitted.) *In the Interest of M. K.*, 288 Ga. App. at 73 (2).

Pretermitting the fact that our finding in Division 1, supra, requires the reversal of the court's order, we address this issue because the evidence presented not only

---

adoption, he did nothing to protect his parental interests until the adoption agency filed a petition for termination of his parental rights. This evidence showed that the father had abandoned his opportunity interest and supported the denial of his legitimation petition.).

[10] The trial court did not address whether Brannon was fit to be a parent, nor did Brannon present any evidence on that issue.

fails to show that C. B. N. would benefit in any way by the grant of Brannon's legitimation petition, it actually suggests that placing the seven-year-old girl in a situation in which she must communicate and visit with a man whom she has never known could potentially be harmful. For example, it is undisputed that Brannon was 50 years old when he filed his legitimation petition in February 2011, which means he was at least 46 years old when he was arrested and incarcerated for possession of methamphetamine and Darvocet in 2008. At the time of that arrest, he was addicted to methamphetamine, and he already had an extensive criminal history that included four convictions for driving under the influence and a designation as a habitual violator; a conviction for criminal damage to property; a conviction for fleeing and attempting to elude a police officer; a conviction for reckless driving; a conviction for possession of a firearm by a convicted felon; and two convictions for possession of methamphetamine. Further, at the time of the February 2012 legitimation hearing, Brannon had been unemployed since his triple bypass heart surgery in November 2010, although he had made some money selling scrap metal he collected from his yard.

Moreover, the transcript of Brannon's deposition shows that, when he was asked why he was seeking to legitimate his relationship with C. B. N. five years after

13

learning that he was her biological father, he responded, "Because she's my daughter, and that's my . . . God-given right. And . . . I would have done it sooner if I'd had myself straightened out to where I could do something like that." He added that "she needs her father," explaining that he had "been without [his father], and I know what it's about." When asked why he believed it was in C. B. N.'s best interest to have a relationship with him, given his criminal and drug history, he responded, "I don't know . . . why my history would have anything to do with it."

In contrast to Brannon's testimony, Neill testified that she had stopped using illegal drugs before C. B. N. was born, although she admitted to using drugs one time in 2006. There is no evidence that Neill has a criminal history. Further, she got married in 2011, and her husband has been the primary "father figure" in C. B. N.'s life for over three years.

We conclude that, under these circumstances, Brannon failed to meet his burden of showing that legitimation was in the best interest of C. B. N. This conclusion establishes an alternate basis for reversing the trial court's legitimation order.

3. Given our decisions in Divisions 1 and 2, supra, the court's grant of visitation to Brannon, which was dependent upon the grant of the legitimation

14

petition, is vacated as a matter of law. See *Ernst v. Snow*, 305 Ga. App. 194, 198 (2) (699 SE2d 401) (2010) (This Court held that, because we were vacating the juvenile court's grant of the petition to legitimate, "all orders of the court dependent on that order are also vacated. Until legitimation is properly entered, only the mother is entitled to custody of the child.") (citation omitted).

*Judgment reversed in part and vacated in part. Phipps, P. J., and Dillard, J., concur.*