**THIRD DIVISION**
**MILLER, P. J.,**
**MCFADDEN and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**July 7, 2016**

# In the Court of Appeals of Georgia

A16A0612. IN THE INTEREST OF J. M., a child.

McMILLIAN, Judge.

After this Court granted his application for discretionary appeal, the putative father of J. M. appealed the juvenile court's order denying his petition to legitimate the child. We affirm for the reasons set forth below.

"We review a trial court's ruling on a legitimation petition for abuse of discretion." *Binns v. Fairnot*, 292 Ga. App. 336, 337 (665 SE2d 36) (2008). In so doing, we review the trial court's factual findings for clear error and will only sustain such findings if there is competent evidence to support them. *Neill v. Brannon*, 320 Ga. App. 820, 822 (1) (738 SE2d 724) (2013).

J. M. was born March 4, 2014, and at the time both J. M. and his mother tested positive for methamphetamine. The next day, the Department of Family and Children

Services (DFACS) filed a dependency complaint and petition to obtain custody of J. M. The juvenile court held a dependency hearing and later issued an order placing J. M. in DFACS's custody on May 29, 2014. The putative father filed his petition for legitimation on December 4, 2014, and the juvenile court held a hearing on the petition on April 27, 2015.

At the hearing, the parties stipulated to the fact that DNA testing showed that the putative father was J. M.'s biological father. However, J. M.'s mother testified that she opposed the legitimation of her child because she did not believe that the putative father's behavior would change. She said that he did not have a job, was still doing drugs, and was back in jail. She also stated that she did not like the neighborhood in which he lived because a lot of people in the vicinity used drugs. Both parents had a history of drug use, and they used drugs together on multiple occasions, sometimes at the house where the putative father was living. The mother said that the putative father and she had no romantic relationship and had only slept together once. She had believed that someone else was the father of J. M. until the DNA test showed otherwise. The mother had decided to surrender her rights in J. M. to give him a better life and stability in the home where he had been his whole life because neither the putative father nor she were able to provide J. M. a home.

2

At the time of the hearing, the putative father had been in jail for approximately two months awaiting trial on charges of possession of methamphetamine, possession of tools for the commission of a crime, and possession of a firearm during the commission of a criminal offense. Since the time of J. M.'s birth, the putative father also had been arrested on another occasion but had bonded out. And at some point he had pled guilty to several charges of misdemeanor theft by receiving. Prior to his arrest on February 11, 2015, the putative father had been living with his grandparents and had been attempting to get into a drug rehabilitation program. He said that he had worked for about six months for a construction company and then about three months for a pizza delivery business, although he had been unemployed for about one month before his arrest. The putative father had never owned his own home, never been married, and never fathered another child.

The putative father said that he had started using drugs approximately ten years earlier when he was a teenager, and he ultimately became a heroin addict. He said he went to substance abuse treatment in connection with that addiction and successfully completed the program, with one relapse since; however, he had begun using methamphetamine prior to his arrest.

3

During her pregnancy, J. M.'s mother told the putative father he was not the biological father of the child, but he nevertheless bought her groceries and a washer and dryer before J. M.'s birth. The putative father said that he first realized that J. M. could be his child when he saw a picture taken about one week after the child's birth, and he then sought a DNA test. Since that time he had been visiting J. M. every week. Although he did not provide any child support, he had given the child gifts at Christmas. He hoped to go straight to an inpatient treatment facility after he was released from jail, and during his incarceration, he had been attending substance abuse and life skills classes, as well as Narcotic Anonymous and Alcoholics Anonymous meetings. The putative father said that he wanted to legitimate J. M. because he wanted to be a better father than he previously had been and a better father than his own father.

DFACS created a case plan for the putative father on December 30, 2014, which required that he maintain stable housing; legitimate J. M.; attend and successfully complete parenting classes; complete a substance abuse assessment and follow all treatment recommendations; attend all visits with the child; remain drug and alcohol free for six consecutive months and test negative on random drug tests; arrange for adequate child care; attend and complete a psychological evaluation and

4

follow the recommendations; and enroll and successfully complete an inpatient drug rehabilitative program. The DFACS case worker assigned to J. M.'s case testified that the putative father had completed only certain requirements of his case plan. He had submitted to the substance abuse and psychological evaluations and to three DFACS drug tests, but he tested positive for drugs on all three.

The guardian ad litem appointed to the case recommended that the trial court deny the putative father's petition for legitimation based, inter alia, on his long history of drug use and his lack of a steady employment history.

In considering a petition to legitimate,

> the court must initially determine whether the father has abandoned his opportunity interest to develop a relationship with the child. Then, depending on the nature of the putative father's relationship with the child and other surrounding circumstances, the standard for evaluating whether legitimation is appropriate is either a test of his fitness as a parent or the best interest of the child.

(Citation omitted.) *In the Interest of B. H.-W.*, 332 Ga. App. 269, 272 (3) (772 SE2d 66) (2015). See also *In the Interest of Baby Girl Eason*, 257 Ga. 292, 296 (1) (358 SE2d 459) (1987). In considering the best interest of the child, the juvenile court "is not bound by the desires and contentions of the parents" but instead "must examine

the benefits that might flow to the child if [he or] she were legitimated and to consider the legal consequences of the grant of the petition." (Citation omitted.) *In the Interest of M. K.*, 288 Ga. App. 71, 73 (2) (653 SE2d 354) (2007). Thus, "trial courts may consider the best interest of the child and deny the petition under certain circumstances, even if the petitioner is in fact the biological father of the child." *In the Interest of C. L.*, 284 Ga. App. 674, 676 (1) (644 SE2d 530) (2007). See also OCGA § 15-11-26 (listing factors to be evaluated "[w]henever a best interests determination is required").[1]

Here, the juvenile court issued an oral ruling at the April 27, 2015 hearing denying the legitimation petition and entered a written order to that effect on September 1, 2015 (the "September 1 Order").[2] In the written order, the juvenile court

---

[1] The legitimation proceeding in this case was initiated after the new Juvenile Code, including the current version of OCGA § 15-11-26, went into effect. See Ga. L. 2013, pp. 294, 514 § 5-1.

[2] The putative father subsequently filed a motion to vacate the September 1 Order, and the trial court held an evidentiary hearing on the motion on September 22, 2015. The trial court issued an order denying the motion on October 2, 2015 (the "October 2 Order"). However, the putative father had filed his application for discretionary appeal of the September 1 Order the day before, on October 1, 2015. This Court granted the application on October 23, 2015 , and the putative father filed his notice of appeal in this case the same day. Although the notice of appeal referenced both the September 1 and October 2 Orders and he cites evidence presented at the September 22 hearing in his appellate brief, the putative father

6

found that the putative father was an unrehabilitated user of illegal drugs over a ten-year period; nothing prevented him from rehabilitating himself during that period; after DFACS issued the case plan, the putative father should have stayed clean and immediately begun supporting his child, yet the putative father did not provide any diapers, clothes, or other forms of support for J. M., other than a few "token gifts"[3]; the putative father failed to take parenting classes despite having the opportunity to do so while incarcerated; the putative father failed to complete other portions of his case plan; the putative father failed to take the requisite steps to prove to the court that he wanted the child in his care; the putative father is in need of substance abuse rehabilitation; and the putative father has no clear plans for supporting the child. The juvenile court also found that J. M. had been with the same foster care family since his birth and further found that "based on the testimony that this mother is putting the

_____

confines his appellate argument and request for relief to seeking reversal of the September 1 Order and not the October 2 Order. Therefore, we will consider any argument regarding the October 2 Order to be abandoned and will instead confine our review to the September 1 Order. Consequently, we will not consider the evidence from the September 22 hearing, as such evidence was not available to the juvenile court when it issued its September 1 Order.

[3] See OCGA § 19-7-24 ("It is the joint and several duty of each parent of a child born out of wedlock to provide for the maintenance, protection, and education of the child until the child reaches the age of 18 or becomes emancipated, except to the extent that the duty of one parent is otherwise or further defined by court order.").

child's best interest before her own in that the mother believes that the foster parents have been this child's parents." Based on these findings, the juvenile court denied the petition, concluding that although the putative father did not abandon his opportunity interest in the child, legitimation would not be in the child's best interests.

1. On appeal, the putative father asserts that the juvenile court erred in finding that he had the opportunity to take parenting classes while incarcerated, as no evidence was presented at the hearing on whether such classes were available. And, indeed, we found no such testimony in our review of the April 27 hearing, although the juvenile court judge may have had independent knowledge of the classes offered at the jail. But even discounting that finding, we conclude that the juvenile court's remaining findings are supported by clear evidence, and that evidence is sufficient to support the trial court's denial of the legitimation petition.

2. The putative father also asserts that the juvenile court erred in basing his ruling on a determination of whether he was fit to assume immediate custody of J. M. because the father was not seeking custody and the determination of custody is separate from that of legitimation. However, the best interests analysis as codified under OCGA § 15-11-26 includes consideration of:

(1) [t]he physical safety and welfare of such child, including food, shelter, health, and clothing;

(2) [t]he love, affection, bonding, and emotional ties existing between such child and each parent or person available to care for such child;

* * * *

(4) [s]uch child's need for permanence, including such child's need for stability and continuity of relationships with his or her parent . . . and any other person who has provided significant care to such child;

(5) [s]uch child's sense of attachments, including his or her sense of security and familiarity, and continuity of affection for such child;

(6) [t]he capacity and disposition of each parent or person available to care for such child to give him or her love, affection, and guidance and to continue the education and rearing of such child;

(7) [t]he home environment of each parent or person available to care for such child considering the promotion of such child's nurturance and safety rather than superficial or material factors;

(8) [t]he stability of the family unit and the presence or absence of support systems within the community to benefit such child;

* * * *

(13) [t]he least disruptive placement alternative for such child;

* * * *

(17) [t]he preferences of the persons available to care for such child;

* * * *

(19) [a]ny recommendation by a court appointed custody evaluator or guardian ad litem; and

(20) [a]ny other factors considered by the court to be relevant and proper to its determination

Although as part of the best interests analysis the juvenile court considered the putative father's interest in caring for J. M., his ability to support the child if placed in his care, and the child's current placement, we find that the consideration of such factors was proper under OCGA § 15-11-26 and did not constitute an abuse of discretion.

Therefore, we cannot say that the juvenile court abused its discretion in denying the putative father's petition to legitimate J. M.[4] See *Neill*, 320 Ga. App. at 827 (2).

*Judgment affirmed. Miller, P. J., and McFadden, J., concur.*

---

[4] In fact, the putative father's appellate counsel stated at the September 22, 2015 hearing on the motion to vacate, that she chose to file a motion to vacate instead of an application for discretionary appeal following entry of the September 1 Order, because her review of the transcript from the April 27 hearing revealed that "there just weren't any reversible errors that jumped out at me" and that she "could not find that the Court had made a mistake."