### A11A1694. MAGDANGAL v. HENDRIX.
(722 SE2d 130)

MIKELL, Chief Judge.

Astrid C. Magdangal, the biological mother of J. M., appeals from the trial court's order legitimating William Hendrix as the father, granting joint legal custody of J. M. to both parents, with physical custody in Magdangal, and ordering visitation and child support payments by Hendrix.

> Before granting a petition to legitimate, the court must initially determine whether the father has abandoned his opportunity interest to develop a relationship with the child. Then, depending on the nature of the putative father's relationship with the child and other surrounding circumstances, the standard for evaluating whether legitimation is appropriate is either a test of his fitness as a parent or the best interest of the child.[1]

This Court reviews a trial court's ruling on a legitimation petition for an abuse of discretion.[2] Further, "factual findings made after a hearing shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. . . . The appellate courts will not disturb fact findings of a trial court if there is any evidence to sustain them."[3]

Hendrix and Magdangal attended the Harvest Fire Church International, a congregation of 40 to 50 people, where Hendrix was very active in children's ministries. They first became friends when

---

[1] (Footnote omitted.) *Morris v. Morris*, 309 Ga. App. 387, 388-389 (2) (710 SE2d 601) (2011).

[2] Id.

[3] (Citation and punctuation omitted.) *Harris v. Williams*, 304 Ga. App. 390-391 (696 SE2d 131) (2010).

they both had leadership roles in a martial arts program for children at the church and then began dating in September 2003. In approximately October 2003, the couple became sexually active.

During their three-year relationship, Hendrix continued to be very active in the church, participating as an usher, in the music ministry, and in praise and worship, in addition to the children's ministries. His minister described him as an excellent role model and as being willing to take responsibility. It was Hendrix's goal to attend a bible school in order to enter the ministry, and his pastor and church supported that goal. Magdangal, at that time, also supported Hendrix's effort to obtain this education, even though it meant that he would be in Oklahoma during part of her pregnancy in 2006. Hendrix attended one doctor's appointment with Magdangal during her pregnancy, when the gender of the child was determined. According to Hendrix, Magdangal called him after all of the other doctor's appointments and discussed with him the status of the pregnancy. Hendrix was able to hear the baby's heartbeat for the first time over the telephone. Hendrix was excited about the prospect of being a father and anticipated having a relationship with his son.

Eventually, Hendrix returned to Georgia from school because it was too difficult being away. Hendrix purchased gifts for the baby and items to use in caring for him. Hendrix and Magdangal's relationship became contentious, and Pastor Dennington of their church attempted to counsel them during the pregnancy. The pastor testified that he felt it was probably not in the best interest of the child or the couple for them to get married due to immaturity and personality conflicts between them.

Hendrix became concerned about whether he was the father of the baby because he had not had relations with Magdangal during the time when she said the child had been conceived. Also, Magdangal began to harass Hendrix by asking if he thought the child was his. In the spring of 2006, Magdangal told Hendrix that she had had sex with another man during their relationship. Also, Magdangal had confided in Hendrix's mother that she had been intimate with someone else. Later, during her sixth month of pregnancy, Magdangal told Hendrix that she was going to bring in another man to be the child's father.

Because of his concerns, Hendrix requested that Magdangal agree to have a DNA test following the child's birth. Magdangal initially agreed, but then changed her mind repeatedly and never agreed to the test. Because of this issue and continuing difficulties in the relationship, Hendrix decided to end the relationship with Magdangal. Because he had become very upset over the issue, Hendrix's mother, Sherry Hendrix, agreed to contact Magdangal, with whom she had become close. On April 27, 2007, Sherry Hendrix

called Magdangal and told her the relationship was over.

Following the birth of J. M. on April 29, 2007, Hendrix continued to express to his mother his desire to be involved in J. M.'s life. In mid-June, Hendrix was served with an abandonment warrant, and the hearing was held on July 17, 2007. At that time, Hendrix requested a court-ordered DNA test and opened a child support case in Cherokee County on J. M. For reasons not reflected in the record, Hendrix did not receive the results from the DNA test until 13 months later, on April 19, 2008. The result was that he was, in fact, the father of J. M. Hendrix began making child support payments in June 2008 and has continued to make them. Hendrix immediately began to seek legal assistance to begin the legitimation process, but realized that he was financially unable to do so. Hendrix continued to work to get the financing together and eventually found his trial counsel, who agreed to work out a payment schedule for him. On April 23, 2010, Hendrix initiated this legitimation proceeding.

Hendrix paid a medical bill of $336 for J. M. when Magdangal made him aware of it and sent letters and made calls to Magdangal to inquire about insurance needs for J. M., but received no response from her. Hendrix did list J. M. as his beneficiary on a life insurance policy provided by his work. Hendrix acknowledged that he had never met his son and had not sent Christmas and birthday cards or presents prior to the legitimation hearing. He did send approximately $800 worth of baby items, some of which he purchased, to Magdangal. Also, he had attempted to see his son on at least one occasion following his birth.

Pastor Dennington believed that Hendrix had matured a great deal over the three years prior to the legitimation hearing and, in his opinion, it would be in the best interest of the child to have a relationship with Hendrix.

Magdangal had been involved with Derek Cassier for three years at the time of the legitimation hearing in November 2010. Cassier testified that he first met J. M. when the baby was six months old and that J. M. refers to Cassier as "daddy." Magdangal testified that she did not see any benefit to her son having a relationship with his biological father and that she could not respect him as a co-parent. Both Cassier and Magdangal said they were in a monogamous committed relationship, but they were not married. Magdangal testified both that she and J. M. lived with her parents and that she and J. M. lived with Cassier.[4]

1. Magdangal's first three enumerations of error are that the

---

[4] Cassier said they had lived together since the winter of 2009, although Magdangal verified interrogatories in May 2010 stating that she lived with her parents.

trial court erred in finding that Hendrix "had not abandoned his opportunity interest to legitimate"; that there "was no evidence of the biological father abandoning his opportunity interest"; and that he "had not abandoned his opportunity interest by paying his child support even though he did not participate in the child's life in any other way."

Because all of these address the first prong of the legitimation inquiry, they are addressed together.

We find that, based on the facts set out above, the trial court did not err in its findings that Hendrix did not abandon his opportunity interest to legitimate. In making this decision, we note that the appropriate inquiry is not whether "the father could have done more," but rather whether the father "has done so little as to constitute abandonment."[5]

While Magdangal argues that Hendrix did not make enough effort to form a relationship with the child following its birth, it is apparent that, during her pregnancy, Hendrix was involved and interested in his child.[6] Upon finding out that there was a question as to his paternity, Hendrix immediately sought DNA testing, which Magdangal refused until a court intervened. Upon Magdangal's filing of the abandonment petition, Hendrix initiated a child support proceeding and began paying child support pursuant to the court order. Further, upon receipt of the DNA results, Hendrix initiated this legitimation proceeding as soon as he was financially able to do so.[7]

The trial court's conclusion that Hendrix did not abandon his opportunity interest in developing a relationship with the child is not clearly erroneous and will not be disturbed here.

2. Magdangal's remaining enumerations are without merit.

*Judgment affirmed. Dillard and Boggs, JJ., concur.*

DECIDED JANUARY 12, 2012 — 

*Gregory D. Golden*, for appellant.

*Abbott & Abbott, Robert K. Abbott, Jr., Hill-MacDonald, Vic B. Hill*, for appellee.

---

[5] *Binns v. Fairnot*, 292 Ga. App. 336, 338 (665 SE2d 36) (2008).

[6] *Turner v. Wright*, 217 Ga. App. 368, 369 (1) (457 SE2d 575) (1995) (father's interest and actions both during the pregnancy and after the child's birth are equally significant in determining abandonment issue); see also *Caldwell v. Meadows*, 312 Ga. App. 70 (717 SE2d 668) (2011).

[7] *Binns*, supra at 337 (father did not file legitimation petition until the child was over three years old due to his inability to afford an attorney).