**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 4, 2018**

# In the Court of Appeals of Georgia

A18A1117. BRUMBELOW v. MATHENIA et al.

DILLARD, Chief Judge.

Joshua Brumbelow appeals the trial court's denial of his petition to legitimate his biological son, E. M., and its subsequent denial of his motion for a new trial. Specifically, Brumbelow argues that the trial court erred in finding that he abandoned his opportunity interest in developing a parent-child relationship with E. M. and that its judgment was not supported by the evidence.[1] For the reasons set forth *infra*, we reverse and remand the case with direction.

---

[1] Brumbelow also raises a constitutional challenge, which we do not address for the reasons set forth in Division 1 *infra*.

Viewing the evidence in the light most favorable to the trial court's ruling,[2] the record shows that toward the end of 2015, Brumbelow and Jenny Mathenia (who was separated from her husband at the time) engaged in a one-time sexual encounter, and she became pregnant. Approximately one month after Mathenia learned that she was pregnant, she informed Brumbelow of the pregnancy. At first, they discussed the possibility of raising the child together. But as Mathenia acknowledges, as soon as she learned of the pregnancy, she was "mean" to Brumbelow and "cussed him out" via text message because she "didn't want a kid with him." And throughout the pregnancy, Brumbelow repeatedly denied that he was the child's father, despite Mathenia telling him "tons of times" that the baby was his child.[3]

---

[2] *See, e.g.*, *In the Interest of J. M.*, 289 Ga. App. 439, 440 (657 SE2d 337) (2008).

[3] Mathenia's testimony regarding Brumbelow's repeated denials that he was E. M.'s father was conflicting. On the one hand, she claimed Brumbelow continually denied his paternity *throughout her pregnancy* (notwithstanding her repeated assurances that he was the father), asserting that "every time he would call," they argued about whether he was the father. On the other hand, Mathenia asserted that (1) she "cut off all contact" with Brumbelow early in the pregnancy (*i.e.*, "a little after" February 2016), (2) she did not tell him anything about her pregnancy in the months leading up to E. M.'s birth, and (3) Brumbelow never contacted her before the baby was born. In any event, despite his initial denials of paternity, it is undisputed that, almost immediately after Brumbelow learned of E. M.'s pending adoption, he filed a legitimation petition, which was several months before DNA results confirmed that he was the child's father.

2

Although Mathenia informed him of the time period when she had been "romantically involved" with her husband, Brumbelow still doubted that he was E. M.'s father, in part, because of the marital relationship. For this reason, at some point early in the pregnancy, Brumbelow accompanied Mathenia to a doctor's appointment to find out how many weeks she had been pregnant, so he could "do the math" and determine whether he was the child's father. And while Brumbelow thought the timing was "off about a week or two[,]" he nevertheless offered to pay for Mathenia to have an abortion. She flatly declined. Then, sometime "a little after" February 2016, Mathenia "cut off all contact" with Brumbelow because he continued to deny that he was E. M.'s father. As a result, during the entirety of Mathenia's pregnancy, Brumbelow never asked about her well-being or if she needed anything. And although Brumbelow knew where Mathenia lived, he never visited her. Brumbelow also never offered Mathenia any financial support during the pregnancy (*e.g.*, money for doctor's appointments, maternity clothes, or the like). But in May 2016, approximately two months before E. M. was born, Mathenia communicated via text message with Brumbelow's mother about him being the child's father, and among other things, Mathenia told her about "cussing [Brumbelow] out" and not wanting to raise a child with him.

3

E. M. was born on July 10, 2016, and the following day, Mathenia voluntarily relinquished her parental rights. That same day, E. M. went home from the hospital with Lance and Ashley Hall, who planned to adopt the child, and he has remained in their custody ever since. Although Mathenia knew that Brumbelow was E. M.'s biological father, she did not inform him of the child's birth because she did not think it was "her job" to do so. Nevertheless, within a month of the baby being born, when Brumbelow and his mother learned E. M. had been placed with a family for adoption, Brumbelow contacted Mathenia and told her that he wanted to be a father to their child. And around the same time, Brumbelow's mother also contacted Mathenia and offered to help her and Brumbelow raise the child. To this end, Brumbelow's mother asked Mathenia to meet with Brumbelow at his attorney's office so that she could "consent for [Brumbelow] to fight for custody," and Mathenia agreed to do so.

During the meeting at the attorney's office, which was some time in August 2016, Mathenia expressed her "desire . . . to revoke [the] surrender of [her] parental rights" and to be E. M.'s mother. Mathenia explained that, despite initially agreeing to the adoption, she had been "on and off" about going through with it, and that she struggled with making the decision. And at least as of this meeting (which occurred approximately one month after E. M. was born), Mathenia wanted to revoke the

4

surrender of her parental rights and co-parent E. M. with Brumbelow.[4] Shortly after the meeting, on August 23, 2016, Mathenia returned to the attorney's office and acknowledged service of Brumbelow's legitimation petition, which was filed the same day.

After agreeing at the August 2016 meeting that they would raise E. M. together as his parents, Mathenia and Brumbelow had no further contact until the first hearing in this legitimation case, which was held in mid-September 2016. During that intervening time period, unbeknownst to Brumbelow, Mathenia changed her mind and decided to contest his efforts to legitimate E. M. and proceed with the adoption. For this reason, the Halls hired separate counsel for themselves and Mathenia to represent them in the legitimation proceeding. And in a separate action, the Halls filed a petition to adopt E. M., which was then consolidated with the legitimation

---

[4] During the legitimation hearing, Mathenia testified she felt pressured and intimidated by Brumbelow and his mother while they were at his attorney's office. But Mathenia also claimed that she was being truthful when she expressed a desire to be E. M.'s mother, revoke the surrender of her parental rights, and let Brumbelow be E. M.'s father. It is not entirely clear, then, what Mathenia felt pressured to do given that Brumbelow's sole request was that she support *his* efforts to legitimate E. M.

5

proceeding for trial.[5] Ultimately, following a hearing, the trial court denied

Brumbelow's petition to legitimate E. M. Thereafter, Brumbelow filed a motion for

a new trial, and a motion to stay the adoption proceedings. After the Halls and

Mathenia filed a joint response to both motions, the trial court held a hearing on the

matter.[6] The trial court summarily denied Brumbelow's motion for a new trial, but

granted his motion to stay the adoption proceedings. This Court then granted

Brumbelow's application for a discretionary appeal, which is now before us.

---

[5] The Halls' petition for adoption is absent from the record. As a result, we cannot determine exactly when it was filed or review its contents. Nevertheless, undisputed statements by Brumbelow's attorney during the legitimation hearing indicate the petition was filed on September 1, 2016, about a week after the legitimation petition was filed. As explained below, the trial court has stayed the adoption proceedings until this legitimation action is resolved, and the Halls' pending adoption petition is not at issue in this appeal.

[6] A review of the trial court orders indicates that a joint hearing on Brumbelow's motions to stay the proceedings and for a new trial was held on September 5, 2017. But Brumbelow's notice of appeal did not state that the transcript should be included in the appellate record, and it has not been transmitted to this Court. Under such circumstances, we must presume the trial court's characterization of the September 5, 2017 hearing is correct. *See Carter v. Moody*, 236 Ga. App. 262, 264 (511 SE2d 520) (1999) ("It is well established that the burden is on the party alleging error to show it by the record and that where the proof necessary for determination of the issues on appeal is omitted from the record, an appellate court must assume that the judgment below was correct and affirm." (punctuation omitted)). Brumbelow's motion to stay the adoption proceedings is also not included in the appellate record, but it is undisputed that he made such a motion, and the trial court granted it.

6

We review a trial court's ruling on a legitimation petition for an abuse of discretion,[7] and its factual findings for "clear error and will only sustain such findings if there is competent evidence to support them."[8] Bearing these guiding principles in mind, we turn now to Brumbelow's specific claims of error.

1. In addition to the claims of error delineated *supra*, Brumbelow also argues, for the first time on appeal, that Georgia law regarding legitimation, in general, violates his constitutional equal protection[9] and due process rights.[10] Brumbelow further asserts that this Court must establish precedent regarding whether he was "deprived of his constitutionally afforded opportunity to form a bond with his child," and that current Georgia law impermissibly favors the rights of prospective adoptive parents over the constitutional rights of a biological father. But regardless of whether these claims have merit, the Supreme Court of Georgia has exclusive jurisdiction over

---

[7] *See In the Interest of J. M.*, 337 Ga. App. 811, 811 (788 SE2d 888) (2016) (punctuation omitted); *accord In the Interest of B. H.-W.*, 332 Ga. App. 269, 272 (3) (772 SE2d 66) (2015).

[8] *In the Interest of J. M.*, 337 Ga. App. at 811; *accord In the Interest of B. H.-W.*, 332 Ga. App. at 272 (3).

[9] *See* U.S. Const. amend. XIV, §1; Ga. Const. Art. I, § I, ¶ II.

[10] *See* U.S. Const., amend. XIV, § 1; Ga. Const. Art. I, § I, ¶ I.

7

". . . all cases in which the constitutionality of a law, ordinance, or constitutional provision has been drawn in question."[11] Thus, we lack jurisdiction over Brumbelow's constitutional challenges.

Additionally, our Supreme Court has

> interpreted this jurisdictional provision to extend only to constitutional issues that were *distinctly ruled on by the trial court* and that do not involve the application of unquestioned and unambiguous constitutional provisions or challenges to laws previously held to be constitutional against the same attack.[12]

---

[11] Ga. Const. Art. VI, § VI, ¶ II; *see Zarate-Martinez v. Echemendia*, 299 Ga. 301, 304 (2) (788 SE2d 405) (2016) (reiterating that the Supreme Court of Georgia "shall exercise exclusive appellate jurisdiction in all cases in which the constitutionality of a law, ordinance, or constitutional provision has been drawn in question." (punctuation omitted)); *Fox v. Norfolk S. Corp.*, 342 Ga. App. 38, 43 (1) (802 SE2d 319) (2017) ("[U]nder Georgia law, our Supreme Court has exclusive jurisdiction over appeals involving construction of the Constitution of the State of Georgia and of the United States and all cases in which the constitutionality of a law, ordinance, or constitutional provision has been called into question." (punctuation omitted)).

[12] *State v. Davis*, 303 Ga. 684, 687 (1) (814 SE2d 701) (2018) (punctuation omitted; emphasis supplied); *see also City of Atlanta v. Columbia Pictures Corp.*, 218 Ga. 714, 719 (4) (130 SE2d 490) (1963) (explaining that the Supreme Court of Georgia "will never pass upon constitutional questions unless it clearly appears in the record that the point was directly and properly made in the [trial] court below and distinctly passed upon by the trial judge").

Here, following the hearing on Brumbelow's legitimation petition, both parties filed post-hearing briefs. And in his post-hearing brief, Brumbelow references, only once, his "due process" rights as an unwed father and that he is entitled to "equal treatment" under the law afforded to other parents. Moreover, his argument relies exclusively on Georgia statutes and prior cases applying our current precedent on legitimation. Finally, Brumbelow did not argue below, as he does now on appeal, that current Georgia law on legitimation is unconstitutional.

Furthermore, the trial court's order denying Brumbelow's petition was based solely on Georgia caselaw regarding legitimation and the related public-policy concerns explicitly delineated in OCGA § 19-8-12 (a) (5), and the court made no mention of whether current Georgia law on legitimation violated Brumbelow's state or federal constitutional rights. Given these particular circumstances, none of the constitutional arguments Brumbelow asserts on appeal were *distinctly* ruled upon or even considered by the trial court. Thus, we decline to transfer this case to the Supreme Court of Georgia, and we address only the non-constitutional claims of error over which this Court has jurisdiction.[13]

---

[13] *See City of Decatur v. DeKalb Cty.*, 284 Ga. 434, 436 (1) (668 SE2d 247) (2008) ("When the appellate record fails to show that the trial court ruled on the constitutional question, this Court is without jurisdiction of an appeal in which this

2. In Brumbelow's two remaining claims of error (which are essentially the same), he argues that the trial court erred in finding that he abandoned his opportunity interest in developing a parent-child relationship with E. M. and that the court's judgment was not supported by the evidence. We agree.

When considering a legitimation petition, we must initially determine whether "the father has abandoned his opportunity interest to develop a relationship with the child."[14] This is because the law affords an unwed, biological father an opportunity to develop a relationship with his offspring, and if he "grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the

Court's exclusive appellate jurisdiction of constitutional issues is invoked, and the appeal is transferred to the Court of Appeals."); *Atlanta Indep. Sch. Sys. v. Lane*, 266 Ga. 657, 658 (1) (469 SE2d 22) (1996) (explaining that the Supreme Court "does not have exclusive appellate jurisdiction over a case where the constitutional issue asserted on appeal has not been raised in and ruled upon by the trial court"); *Griffin v. Burden,* 281 Ga. App. 496, 497 (2) (636 SE2d 686) (2006) (declining to address an argument that a particular state statute was constitutional when, as here, the trial court did not "expressly rule upon" that constitutional issue below).

[14] *Neill v. Brannon*, 320 Ga. App. 820, 821 (1) (738 SE2d 724) (2013) (punctuation omitted); *accord Morris v. Morris*, 309 Ga. App. 387, 388-89 (2) (710 SE2d 601) (2011); *In the Interest of J. M.*, 289 Ga. App. at 442 (1); *Jones v. Smith*, 250 Ga. App. 486, 486 (552 SE2d 112) (2001); *see In re Baby Girl Eason*, 257 Ga. 292, 296 (1) (358 SE2d 459) (1987) (concluding, based on a review of several prior legitimation cases, that "unwed fathers gain from their biological connection with a child an opportunity interest to develop a relationship with their children which is constitutionally protected").

blessings of the parent-child relationship and make uniquely valuable contributions to the child's development."[15] This opportunity interest "begins at conception and endures probably throughout the minority of the child[,]"[16] but it "is not indestructible[,] [and] [i]t may be lost."[17] Indeed, as we have previously explained, the factors which may support a finding of abandonment include, without limitation, "a biological father's inaction during pregnancy and at birth, a delay in filing a legitimation petition, and a lack of contact with the child."[18] And in considering these factors, if the evidence supports a finding that a father abandoned his opportunity

---

[15] *Neill*, 320 Ga. App. at 821 (1) (punctuation omitted); *accord Lehr v. Robertson*, 463 U.S. 248, 262 (I) (103 SCt 2985, 77 LE2d 614) (1983); *Stanley v. Illinois*, 405 U.S. 645, 653 (II) (92 SCt 1208, 31 LE2d 551) (1972); *Binns v. Fairnot*, 292 Ga. App. 336, 338 (665 SE2d 36) (2008).

[16] *Neill*, 320 Ga. App. at 821 (1) (punctuation omitted); *accord In re Baby Girl Eason*, 257 Ga. at 296 (1); *Binns*, 292 Ga. App. at 338.

[17] *Neill*, 320 Ga. App. at 821 (1) (punctuation omitted); *accord In re Baby Girl Eason*, 257 Ga. at 296 (1) ; *Binns*, 292 Ga. App. at 338.

[18] *Neill*, 320 Ga. App. at 821 (1) (punctuation omitted); *accord Wilbourn v. Lumpkin*, 327 Ga. App. 385, 387 (759 SE2d 262) (2014); *Morris*, 309 Ga. App. at 389 (2).

interest in developing a relationship with his biological child, the court is then "authorized to end its inquiry and to deny the legitimation petition on that basis."[19]

Furthermore, our Supreme Court has acknowledged that "there exists a continuum of unwed father-child relationships with assigned degrees of protection afforded rights to custody."[20] On one end are those relationships which have been "fully developed through present or past custody,"[21] and those unwed fathers "must be treated equally with other parents when their child is to be adopted."[22] But there are also relationships between unwed fathers and children which, "while short of full custody, nonetheless establish substantial bonds."[23] Unwed fathers in these

---

[19] *Neill*, 320 Ga. App. at 821-22 (1); *see In the Interest of J. M.*, 289 Ga. App. at 442 (1) ("If the . . . court concludes that the father has abandoned his opportunity interest, that finding is sufficient to end the court's inquiry and justifies the denial of the legitimation petition." (punctuation omitted)); *In the Interest of J. S.*, 302 Ga. App. 342, 344 (691 SE2d 250) (2010) (same).

[20] *In the Interest of Baby Girl Eason*, 257 Ga. at 294 (1); *accord Bowers v. Pearson*, 271 Ga. App. 266, 267 (609 SE2d 174) (2005); *see also Davis v. LaBrec*, 274 Ga. 5, 6 (549 SE2d 76) (2001) (holding that *Eason* "recognized a continuum of rights, specific to the facts of each case, to which varying standards could be applied").

[21] *In the Interest of Baby Girl Eason*, 257 Ga. at 294 (1); *accord Bowers*, 271 Ga. App. at 267-68.

[22] *In the Interest of Baby Girl Eason*, 257 Ga. at 294-95 (1).

[23] *Id.* at 295 (1).

circumstances may "generally visit their children and furnish some support and otherwise maintain contact with them."[24] And then there are other unwed fathers who have "developed no relationship with their children[,] [and] [t]heir only connection is biological."[25]

Lastly, our Supreme Court has also explained that when an unwed biological father demonstrates "a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires *substantial protection* under the Due Process Clause."[26] But the mere existence of a biological connection "does not merit equivalent constitutional protection[,] [and] [t]he actions of judges neither create nor sever genetic bonds."[27] Instead, the significance of the biological connection is that

---

[24] *Id.*

[25] *Id.*; *accord Bowers*, 271 Ga. App. at 268.

[26] *In the Interest of Baby Girl Eason*, 257 Ga. at 295 (1) (citation and punctuation omitted; emphasis supplied); *accord Lehr*, 463 U.S. at 261 (I); *see Thorne v. Padgett*, 259 Ga. 650, 651 (386 SE2d 155) (1989) ("We have held that even an unwed father who demonstrates a commitment to parenthood by participating in the life of his child acquires substantial protection under the Due Process Clause of his parental rights." (punctuation omitted)).

[27] *In the Interest of Baby Girl Eason*, 257 Ga. at 295 (1) (punctuation omitted); *accord Rivera v. Minnich*, 483 U.S. 574, 580 n.7 (2) (107 SCt 3001, 97 LE2d 473)

13

it "offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring."[28]

Turning to the case at hand, Brumbelow argues the trial court applied the wrong legal standard in finding that he abandoned his opportunity interest in developing a relationship with E. M. by basing its decision on everything he did *not* do to pursue that interest, rather than all of the things he did to pursue a parent-child relationship with the child. We agree. Indeed, when considering whether a biological father abandoned his opportunity interest in a relationship with his child, "the appropriate inquiry is not whether the father could have done more, but rather whether the father has *done so little as to constitute abandonment.*"[29] And here, in its

---

(1987); *see Park v. Bailey*, 329 Ga. App. 569, 575 (1) (765 SE2d 721) (2014) ("[B]iology is not destiny, and a man has no absolute right to the grant of his petition to legitimate a child simply because he is the biological father." (punctuation omitted)).

[28] *In the Interest of Baby Girl Eason*, 257 Ga. at 296 (1) (punctuation omitted); *accord Lehr*, 463 U.S. at 262 (I); *Turner v. Wright*, 217 Ga. App. 368, 368 (1) (457 SE2d 575) (1995).

[29] *Magdangal v. Hendrix*, 313 Ga. App. 522, 525 (1) (722 SE2d 130) (2012) (emphasis supplied; punctuation omitted); *accord Caldwell v. Meadows*, 312 Ga. App. 70, 73 (1) (717 SE2d 668) (2011); *see Morris*, 309 Ga. App. at 389-90 (2) (noting that in determining whether a biological father abandoned his opportunity interest in a relationship with his child, the question was not whether he "could have done more," especially in comparison to financial support the father had provided to

order, the trial court relied heavily on Brumbelow's uninvolvement and failure to provide financial or emotional support during Mathenia's pregnancy, despite his ability to do so, as well as his continued failure to provide financial assistance to either Mathenia or the Halls following E. M.'s birth. Ultimately, the court concluded that Brumbelow abandoned his opportunity interest in a relationship with E. M. because his "only action demonstrating any intent to develop a familial bond with [E. M.] was filing his petition for legitimation . . . ." In doing so, the trial court erred. As Brumbelow aptly notes, the trial court appears to have applied the wrong legal standard for considering legitimation petitions. But regardless, the trial court's conclusion that the *only* action Brumbelow took to preserve his opportunity interest in a relationship with E. M. was filing the legitimation petition is not only unsupported by the evidence, it is also in direct conflict with the court's own factual findings.

---

another sibling); *Binns*, 292 Ga. App. at 338 (pretermitting whether the father could have done more to pursue a relationship with his child, and holding that, regardless of what else the father could have done, the evidence did not support a finding that he had "done so little as to constitute abandonment").

15

First, the trial court failed to give any meaningful consideration to Brumbelow's decision to file a legitimation petition shortly after E. M.'s birth. Our appellate courts routinely, if not always, place at least *some* significance on the length of time a biological father waits before filing a legitimation petition after learning of the possibility that he might be the child's father (or, at the very least, indicate that any delay or lack thereof was taken into consideration).[30] In many of those cases, the

---

[30] *See, e.g.*, *Quilloin v. Walcott*, 238 Ga. 230, 233, 233 (232 SE2d 246) (1977) (holding that a biological father's constitutional rights to legitimate his child were not violated when the father waited 11 years before taking steps to legitimate or support his child and when he only did so after the child's stepfather sought to adopt the child); *Wilbourn*, 327 Ga. App. at 386-87 (noting that an unwed biological father's opportunity interest in developing a relationship with his child can be abandoned if not timely pursued and affirming the denial of a legitimation petition because, *inter alia*, it was filed four years after the child was born); *Neill*, 320 Ga. App. at 825 (1) (holding that the biological father abandoned his opportunity interest in a parent-child relationship, and explaining that "even though [he] did not learn that he was definitely the child's father until the child was one year old, he was aware of the possibility that he could be the biological father before the child was born and, to remove any doubts, he could have filed a legitimation petition right after her birth and sought court-ordered genetic testing"); *Matthews v. Dukes*, 314 Ga. App. 782 786 (726 SE2d 95) (2012) (holding that the biological father abandoned any opportunity interest he may have had in raising his child when, although the father had occasional visits and provided some cash and small gifts, he waited five years to file a legitimation petition), *overruled on other grounds by Brine v. Shipp*, 291 Ga. 376 (729 SE2d 393) (2012); *In the Interest of J. M.*, 289 Ga. App. at 444 (1) (b) (noting that a two-year delay in filing a legitimation petition after the child was born was one of several factors that supported the trial court's conclusion that the father abandoned his opportunity interest); *In the Interest of L. S. T.*, 286 Ga. App. 638, 639 (1) (649 SE2d 841) (2007) (affirming the trial court's conclusion that a biological father

16

unwed father was found to have abandoned his opportunity interest in a parent-child relationship, at least in part, by waiting years after the child's birth to file a legitimation petition.[31] But here, the trial court essentially ignored the fact that Brumbelow filed his petition when E. M. was less than two months old and almost immediately after he learned of the planned adoption. In fact, Brumbelow filed the legitimation petition even before the Halls initiated the adoption proceeding[32] and months before DNA results confirmed that he, rather than Mathenia's husband, was

abandoned his opportunity interest when, *inter alia*, he waited two years after the child was born to file his petition, during which time she was in foster care and his only contact with her was a single phone call); *Bowers*, 271 Ga. App. at 270-71 (holding that the evidence did not support the trial court's denial of the biological father's legitimation petition when, *inter alia*, the father filed his legitimation petition even before the child's birth); *Smith v. Soligon*, 254 Ga. App. 172, 173-174 (2) (561 SE2d 850) (2002) (holding that a biological father abandoned his opportunity interest in a parent-child relationship when, *inter alia*, he did not file a legitimation petition until the child was over six years old).

[31] *See supra* note 30.

[32] *See supra* note 5. *Cf. Quilloin*, 238 Ga. at 230, 233 (affirming the denial of a biological father's petition to legitimate his child and for visitation when "[t]he natural father made no effort to legitimate the child or to obtain visitation rights until *after* the child's stepfather filed the adoption petition" (emphasis supplied)); *Smith*, 254 Ga. App. at 173-74 (2) (holding that a biological father abandoned his opportunity interest in a parent-child relationship when, although the biological father had lived with the child until the child was four years old, he did not file a legitimation petition until the mother married and her husband filed an adoption petition when the child was over six years old).

17

E. M.'s biological father.[33] While the expeditious manner in which Brumbelow initiated this action is only one of many factors to be considered and is certainly not dispositive, the trial court's order makes no mention of the undisputed evidence that Brumbelow obtained counsel and initiated this action almost immediately after learning Mathenia placed E. M. with the Halls for adoption. Indeed, although the trial court's order includes other dates relevant to this proceeding, it makes no reference

---

[33] As explained *supra*, Brumbelow filed this action on August 23, 2016, which was just over one month after E. M. was born and months before the parties received the court-ordered DNA results confirming his paternity. While a biological father is "not required to wait for the scientific certainty afforded by a DNA test to pursue a legitimation petition[,]" *Wilbourn*, 327 Ga. App. at 386-87, it should not be entirely discounted that, even when Mathenia was married to someone else at the time of conception, Brumbelow did *not* wait for the results of a DNA test before seeking to legitimate E. M. Indeed, in at least one case, that is *exactly* what this Court indicated a biological father in similar circumstances should have done in order to preserve his rights. *See Neill*, 320 Ga. App. at 825 (1) (affirming the denial of a legitimation petition when the biological father waited one year until a DNA test confirmed his parentage to pursue a relationship with his child, explaining that he could have removed any doubt by filing a legitimation petition as soon as the child was born and seeking court-ordered genetic testing).

to the date on which Brumbelow's legitimation action was filed.[34] Suffice it to say, this omission is notable.

Furthermore, the trial court also discounted other evidence—which was either undisputed by the parties or supported by *Mathenia's* testimony—of actions that Brumbelow and his mother (on her son's behalf) took to preserve his opportunity interest in a relationship with E. M. And while an unwed father's "disregard of his opportunity interest during [the mother's] pregnancy is as significant as such a disregard after the child is born[,]"[35] Mathenia admitted to engaging in conduct that would have made it difficult for Brumbelow to contact or assist her during the

[34] *See Neill*, 320 Ga. App. at 821 (1) (explaining that factors which may support a finding of abandonment include, *inter alia*, whether there was a delay in filing a legitimation petition); *Wilbourn*, 327 Ga. App. at 387 (same); *Morris*, 309 Ga. App. at 389 (2) (same). In his brief, Brumbelow complains that the trial court "did not give enough weight to the time[ ]frame within which [he] filed his legitimation petition." And, of course, it is the trial court, not this Court, that determines how much weight to give to the evidence. *See In the Interest of D. F.*, 251 Ga. App. 859, 859 (555 SE2d 225) (2001) ("This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met." (punctuation omitted)). But the error here is that the trial court failed to even acknowledge the timeliness of Brumbelow's petition, despite this Court's instruction that any delay (or lack thereof) in filing a legitimation petition is a factor to be considered in ruling on a legitimation petition. *See supra* notes 30 and 31 & accompanying text.

[35] *Turner*, 217 Ga. App. at 369 (1); *accord In the Interest of D. S. P.*, 233 Ga. App. 346, 348 (2) (504 SE2d 211) (1998).

pregnancy. Indeed, not only did Mathenia never ask Brumbelow for assistance (financial or otherwise) during the pregnancy, she testified to cutting off contact with him a few months into the pregnancy, being "mean" to him because she did not want to raise a child with him, and cussing him out via text message for the same reason. So, while we are required to defer to the trial court's finding that Brumbelow made no attempts to contact Mathenia during the remainder of her pregnancy, it is undisputed that Mathenia had already decided not to have any contact with him. And when, as here, a biological mother admittedly shows hostility toward the biological father of her child, *cuts off all contact with him*, and unequivocally advises him that she does not want to raise a child with him, we cannot say—as the trial court's order seems to suggest—that the biological father's failure to contact or offer financial assistance to the biological mother *during* her pregnancy, standing alone, is enough to constitute an abandonment of his opportunity interest in a relationship with his child.[36]

---

[36] *See, e.g.*, *Bowers*, 271 Ga. App. at 267, 271 (holding that the evidence did not support the trial court's denial of the biological father's legitimation petition when, *inter alia*, the father had no contact with and offered no financial assistance to the mother during her pregnancy, but despite his attempts to discuss the matter with her, the mother and her parents refused to talk to him about it and unilaterally placed the child with an adoptive family within a few days of the child's birth without consulting the father). As noted *infra*, by filing the legitimation petition, especially

Additionally, the trial court found that, despite his ability to do so, Brumbelow had not provided any emotional or financial assistance to Mathenia or the Halls since E. M. was born. But Mathenia never had custody of E. M., so she had no need for financial support following his birth other than for her pregnancy and birthing expenses. Furthermore, by filing this action, Brumbelow "agreed to assume all the responsbilities of the child's legal father and submitted to a claim by [Mathenia] for recovery of [these] expenses."[37] The trial court also appears to have ignored that, after E. M. was born, Brumbelow's mother—who lived with Brumbelow in a four-bedroom home with enough space for E. M. to have his own room—contacted Mathenia and volunteered to provide a home for E. M. and to help her and Brumbelow raise their child.[38] Additionally, as to the Halls, they had sole custody of

as soon as he did, Brumbelow voluntarily subjected himself to a claim by Mathenia for reimbursement of pregnancy and birth-related expenses. *See infra* notes 37 and 50 & accompanying text.

[37] *Bowers*, 271 Ga. App. at 271.

[38] While it was not Brumbelow, but his mother, who offered assistance to Mathenia, the offer of assistance was made shortly after E. M.'s birth, well after Mathenia admittedly "cut off all contact" with Brumbelow. The trial court did not include this offer of assistance in its findings of fact and apparently did not consider it to be relevant. But given that Brumbelow lived with his mother at the time and contributed to her monthly housing expenses, the offer appears to have been made, at least in part, on his behalf. And although his mother's offer of assistance was not

E. M. with the intent to adopt him. And while he did not assist the Halls financially or otherwise with regard to the care of E. M., Brumbelow testified that he believed having any direct contact with them would constitute harassment. For their part, the Halls claimed that they would have accepted financial support from Brumbelow if he offered it, but neither of them "felt the need" to contact him because they wanted to "assume the parental responsibility of [the] child." Moreover, although Brumbelow did not offer financial assistance to the Halls, he did make at least one request for visitation through his attorney during the pendency of this litigation, but he received no response.[39]

---

an action taken by him personally, the specific facts and circumstances of this case suggest that the offer should not be entirely disregarded in the broader analysis of whether Brumbelow did so little as to constitute abandonment. *See, e.g., Murphy v. Suddeth*, 189 Ga. App. 212, 213, 215 (3) (375 SE2d 254) (1988) (physical precedent only) (affirming the trial court's grant of a legitimation petition even when "the [biological] father negligently and affirmatively ignored his daughter's existence, making no contribution to her support and making no direct inquiries as to her welfare and progress[,]" but there was evidence that, *inter alia*, the paternal grandmother "began sending payments to appellant which the latter received 'under protest'").

[39] The Halls and Mathenia testified that they did not recall receiving an email from Brumbelow's attorney with a request for visitation, but in its order, the trial court found that the attorney, on Brumbelow's behalf, did make at least one such request on December 29, 2017.

As to the trial court's application of the law in denying Brumbelow's petition, the court relied almost exclusively on our Supreme Court's discussion, set forth *supra*, of the continuum that exists between unwed fathers who have a fully developed relationship with their child and those who have no relationship with their child, such that their only relationship is biological.[40] In applying this analysis, the court found that by his sole action of filing the legitimation petition, Brumbelow had "only slightly moved on the spectrum from a father who has developed absolutely no relationship, with the only connection being biological." But while a consideration of this continuum may be applicable or helpful in many cases, neither the trial court nor Mathenia has identified any precedent suggesting that the application of this continuum is dispositive in *every* case regardless of the particular circumstances.

And here, it is unclear how Brumbelow's action of filing a legal document would move him along the *relationship* continuum, slightly or otherwise—beyond expressing a desire for a future relationship with the child. Indeed, prior to filing the legitimation petition, Brumbelow had no opportunity to develop a relationship or bond with his *one month old* newborn son, who has been in the Halls' custody since birth. It was erroneous, then, for the trial court to limit its consideration to how

_____

[40] *See supra* notes 20-25 & accompanying text.

developed the relationship was between Brumbelow and E. M. without tailoring its analysis to the facts and circumstances of this particular case.[41] As our Supreme Court has rightly acknowledged, "the possible circumstances of relationships between unwed fathers and their children are of great variety. . . ."[42] Furthermore, applying the trial court's reasoning, a biological father's decision to file a legitimation petition when the child is a newborn (which we have previously advised unwed fathers to do)[43] is virtually meaningless, and his only "hope" is for the prospective adoptive

---

[41] *See In the Interest of Baby Girl Eason*, 257 Ga. at 292, 296 (I) (explaining that the factual circumstances of the case went well beyond cases in which the Supreme Court of the United States has based its determination on how developed the relationship was between the biological father and the child when the case involved "an unwed father, an infant some nine months old, adopting parents who have been in custody of the child virtually all its short life, and a mother who has surrendered her rights in the child in favor of the adoption"); *Bowers*, 271 Ga. App. at 267, 270-71 (finding that the biological father had not abandoned his opportunity interest in a relationship with his child, even though the father had no relationship with the child, who had been placed with prospective adoptive parents at birth); *Doe v. Chambers*, 188 Ga. App. 879, 879-80 (1) (374 SE2d 758) (1988) (affirming the trial court's grant of a legitimation petition even though the biological father had not developed a relationship with the child when the child had been placed with adoptive parents shortly after birth).

[42] *In the Interest of Baby Girl Eason*, 257 Ga. at 293 (1).

[43] *See supra* note 33.

parents to give him access to the child in order to develop the type of relationship that may ultimately defeat their petition for adoption. This is not the law.

To the contrary, in *Bowers v. Pearson*,[44] we held that the biological father did not abandon his opportunity interest in a relationship with his child, who the mother unilaterally (and unbeknownst to the father) placed with an adoptive family within days of her birth.[45] Similarly to this case, the trial court in *Bowers* denied the biological father's legitimation petition—which was filed even before the child was born—based on its finding that he abandoned his opportunity interest in a relationship with his child "by failing to provide financial or other assistance to [the mother] during her pregnancy and delivery."[46] In *Bowers*, the mother admitted that she never asked the father for assistance because she (and her parents) did not want him to be involved, and the maternal grandfather indicated that he never asked the father for assistance because he believed it would be "counterproductive in the adoption."[47] And while the biological father filed the legitimation petition a month

---

[44] 271 Ga. App. 266 (609 SE2d 174) (2005).

[45] *See generally id.* at 266-67, 270.

[46] *See id.* at 267.

[47] *Id.* at 271.

25

*before* the child was born, the mother and her parents believed adoption was in the child's best interest, placing the child with prospective adoptive parents shortly after she was born.[48] After detailing the relevant precedent from the Supreme Court of Georgia and this Court, we held that the evidence did not support a finding that the father abandoned his opportunity interest in a natural parent-child relationship.[49] In reaching this conclusion, we emphasized that the mother never asked the father for assistance, the mother and her family did not want him to have any involvement, and by initiating the legitimation action, the father "agreed to assume all the responsibilities of the child's legal father and submitted to a claim by the mother for reimbursement of birthing expenses."[50]

In this case, there was conflicting testimony as to whether, after Brumbelow attended a doctor's appointment with Mathenia, he made any efforts to contact her during the remainder of her pregnancy, and we defer, as we must, to the trial court's

---

[48] *Id.* at 267.

[49] *Id.* at 271.

[50] *Id.* at 270-71.

26

finding that Brumbelow made no such attempts.[51] But similarly to the mother in *Bowers*, Mathenia admitted that, a few months into her pregnancy, she cut off all contact with Brumbelow, she did not want to raise a child with him, and she never asked him for assistance of any kind during the pregnancy. Additionally, while Brumbelow did not file the legitimation petition before the child was born like the father in *Bowers*, he did file it as soon as he learned that Mathenia surrendered her parental rights and the child was in the Halls' custody, which was less than two months after E. M. was born. Significantly, by initiating this action so soon after the child's birth, even before the adoption petition was filed, Brumbelow "agreed to assume all the responsibilities of the child's legal father and submitted to a [potential] claim by [Mathenia] for recovery of birthing expenses."[52]

---

[51] *See Carden v. Warren*, 269 Ga. App. 275, 276 (1) (603 SE2d 769) (2004) ("In a bench trial, the trial court sits as the trier of fact, and it is the sole arbiter of the credibility of witnesses.").

[52] *Bowers*, 271 Ga. App. at 271.

Nevertheless, Mathenia argues that reversing the trial court's ruling "would run entirely counter to" our decisions in *In Interest of D. S. P.*[53] and *Turner v. Wright.*[54] But we distinguished those cases in *Bowers* as follows:

> In [denying the father's legitimation petition], the trial court relied on *In the Interest of D. S. P.* and *Turner v. Wright*, two cases in which it was determined that the biological fathers had abandoned their opportunity interests to develop relationships with their children. The court's reliance on these cases is misplaced. In *D. S. P.*, the father knew the mother intended to put the child up for adoption; but he did nothing until almost two months after the child's birth and offered no financial or emotional support to the mother, even though she needed such support from him. In *Turner*, the father committed criminal acts after he became aware he was to be a father, resulting in his incarceration during the mother's pregnancy and when he filed the petition for legitimation within one month after the child's birth.[55]

We find these distinctions applicable here as well. Indeed, unlike in *D. S. P.*, Brumbelow was *not* aware of the planned adoption in advance, and immediately after he became aware of it, he obtained legal counsel, met with Mathenia to express his

---

[53] 233 Ga. App. 346 (504 SE2d 211) (1998).

[54] 217 Ga. App. 368 (457 SE2d 575) (1995).

[55] *Bowers*, 271 Ga. App. at 271.

desire to be a father to E. M., and filed a legitimation petition (while under the impression Mathenia would support it). *Turner* is similarly inapplicable because it is undisputed that Brumbelow did not engage in any criminal conduct, and his failure to develop a relationship with E. M. is not due to any voluntary choice he made. Instead, here, Mathenia's unilateral decision to proceed with the adoption was the cause of his inability to develop a relationship with his child.[56]

In sum, we are mindful that, as to any conflict in the evidence, the trial court determines "the credibility of witnesses and may accept or reject any part of a witness's testimony, even in the absence of contradictory testimony."[57] But here, even

---

[56] The *Bowers* Court also distinguished *Smith v. Soligon*, 254 Ga. App. 172 (561 SE2d 850) (2002), which the mother in that case relied upon. Specifically, we explained that "[i]n *Smith*, the unwed biological father filed a petition to legitimate his six-year-old son after the mother married another man who sought to adopt the child. Although the father had lived with the mother and child until the child was about four years old, he had never provided the child with any significant emotional or monetary support."*Bowers*, 271 Ga. App. at 271. Such circumstances are easily distinguishable from the instant case, in which Brumbelow pursued his right to a relationship with his son when the child was only one month old. Unlike Brumbelow, the father in *Smith* had years to develop a relationship with his child, provide financial and emotional support to the child, and to seek to legitimate the child, but failed to do so.

[57] *Hayes v. Alexander*, 264 Ga. App. 815, 817 (592 SE2d 465) (2003).

29

crediting Mathenia's testimony and resolving all conflicts in favor of the ruling below, the trial court's conclusion that Brumbelow's "*only action* demonstrating any intent to develop a familial bond with [E. M.] was filing his petition for legitimation"[58] is wholly unsupported by the evidence. Indeed, even the trial court's order acknowledged additional actions Brumbelow took to pursue his opportunity interest in fathering E. M., such as attending at least one prenatal doctor's appointment and requesting visitation with E. M. at least once after the petition for legitimation was filed. Although the trial court may have found those actions to be insignificant, they certainly constitute relevant actions other than filing a timely legitimation petition. Moreover, the trial court failed to acknowledge other actions taken by Brumbelow less than two months after the child's birth, such as obtaining legal counsel, initiating a meeting with Mathenia at his attorney's office to express his desire to parent E. M., and filing the instant action without delay. Additionally, the offer of financial and emotional assistance to Mathenia by Brumbelow's mother should also have been considered by the trial court in its analysis. While Brumbelow

---

[58] (Emphasis supplied).

certainly could have done more, assuming that Mathenia or the Halls would have been receptive to such efforts, that is not—as we have already explained—the relevant legal standard, and given the particular circumstances of this case, we simply cannot say that Brumbelow "has done so little as to constitute abandonment."[59]

---

[59] *Magdangal*, 313 Ga. App. at 525 (1) (punctuation omitted); *see Bowers*, 271 Ga. App. at 270-71 (holding that the evidence did not support the trial court's denial of the biological father's legitimation petition when, *inter alia*, the father had no contact with and offered no financial assistance to the mother during her pregnancy, but he "filed his legitimation petition before the child's birth; [and] [the mother], vested by state law with exclusive control over the not-yet-legitimated child, made a unilateral decision to place the child for adoption" (footnote omitted)); *Doe*, 188 Ga. App. at 880 (1) (holding, in a case in which the mother surrendered her parental rights and the baby was placed in the custody of prospective adoptive parents shortly after birth, that the trial court did not err in finding that a biological father did not abandon his opportunity interest in a parent-child relationship when he did not learn of the pregnancy and birth until two months after the fact, at which point he "vigorously pursued his opportunity interest to establish parental relationship"); *see also Caldwell*, 312 Ga. App. at 72-73 (1) ("While a father's lack of involvement prior to a child's birth is as significant as such a disregard after the child is born, we are aware of no authority limiting a trial court's inquiry into whether a father has abandoned his opportunity interest to the period before the child's birth especially where, as here, the father evinced such a clear intent to be involved in his child's life following his birth." (citation and punctuation omitted)). *Cf. Neill*, 320 Ga. App. at 825-26 (1) (holding that the undisputed evidence established that the biological father abandoned his opportunity interest in a parent-child relationship when, *inter alia*, the father waited four years after learning that the child was his biological daughter before deciding that he wanted to have a parent-child relationship with her and filing a legitimation petition and there was no evidence of any actions by the mother or her family prevented him from filing the petition earlier); *In Interest of D. S. P.*, 233 Ga. App. at 348-49 (2) (holding that the trial court did not err in finding that the biological father abandoned his opportunity interest in developing a relationship with

3. While a finding of abandonment is sufficient to deny a legitimation petition,[60] the trial court also made a summary finding that denying Brumbelow's legitimation petition was in E. M.'s best interests. In this regard, we have explained that when a court determines the unwed father has *not* abandoned his opportunity interest in a parent-child relationship, as we have in Division 2 *supra*, "depending on the nature of the putative father's relationship with the child and other surrounding circumstances, the standard for evaluating whether legitimation is appropriate is either a test of his fitness as a parent or the best interest of the child."[61]

In *In the Interest of Baby Girl Eason*,[62] our Supreme Court acknowledged that there are "circumstances in which the best interests of the child standard is adequate."[63] For example, when there is a divorce "each party has equal rights and a

---

his child when, although he took actions to challenge the adoption and establish paternity only two months after the child was born, he was aware of the mother's plan for the child to be adopted, he had no communication with the mother for at least nine months, and he continually failed to provide any emotional or financial support to the mother).

[60] *See supra* note 19 & accompanying text.

[61] *Morris*, 309 Ga. App. 387, 388-89 (2) (punctuation omitted); *accord Durden v. Anderson*, 338 Ga. App. 565, 565-66 (1) (790 SE2d 818) (2016).

[62] 257 Ga. 292 (358 SE2d 459) (1987).

[63] *Id.* at 296 (1).

fitness test cannot be used, . . . a best interests test is sufficient."[64] And the best-interests-of-the-child standard is likewise adequate when "an unwed father who faces a mother who has custody and a stepfather who seeks to adopt."[65] But these were not the circumstances in *Eason* and they are not the circumstances before us now. Instead, *Eason* concerned "an unwed father, an infant some nine months old, adopting parents who ha[d] been in custody of the child virtually all its short life, and a mother who ha[d] surrendered her rights in the child in favor of the adoption."[66] And under these circumstances, the *Eason* Court concluded that "[t]he adoption laws were being pursued through the courts and this account[ed] for the placement of the child with the adopting parents[,] [and] . . .[t]he unwed father ha[d] a constitutionally protected interest which [could not] be denied him through state action."[67]

---

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.* at 297 (1).

As in *Eason*, the relationship E. M. has developed with his prospective adoptive parents did not take place in the absence of state action. Here, Mathenia,

> vested by state law with exclusive control over the not-yet-legitimated child,[68] made a unilateral decision to place the child for adoption; and, if not abandoned by him, [Brumbelow's] opportunity to develop a relationship with the child will be lost through the action of the court in denying his petition to legitimate."[69]

And when an opportunity to develop a relationship with his biological child is lost due to state action, "a *fit* biological father who pursues his interest in order to obtain full custody of his child must be allowed to prevail over strangers to the child who seek to adopt."[70] This is because Brumbelow has a "constitutionally protected interest

---

[68] *See* OCGA § 19-7-25 ("Only the mother of a child born out of wedlock is entitled to custody of the child, unless the father legitimates the child as provided in Code Section 19-7-22. Otherwise, the mother may exercise all parental power over the child.").

[69] *Bowers*, 271 Ga. App. at 270-71.

[70] *In the Interest of Baby Girl Eason*, 257 Ga. at 296 (1) (emphasis supplied); *accord Doe*, 188 Ga. App. at 880 (1); *see Bowers*, 271 Ga. App. at 270 (holding that when the mother, vested by state law with exclusive control over a not-yet-legitimated child makes a unilateral decision to place the child for adoption, the father, if not abandoned by him, loses his opportunity interest to develop a relationship with the child through state action, and under such circumstances, there is sufficient state action to compel use of the fitness standard in determining the father's right to legitimate the child).

which cannot be denied him through state action."[71] In sum, because Brumbelow has "not abandoned his opportunity interest, the standard which must be used [upon remand] to determine his right to legitimate the child is his fitness as a parent to have custody of the child."[72] And if he is fit, "he must prevail."[73]

Lastly, we acknowledge that OCGA § 19-7-1 (b.1), the current version of which was enacted after *Eason*, provides that a court must consider the best interests of the child "in any action involving the custody of a child between the parents or either parent and a third party limited to grandparent, great-grandparent, aunt, uncle, great aunt, great uncle, sibling, or *adoptive parent* . . . ."[74] But as recently as 2015, this Court held that *Eason* "remains binding precedent despite the adoption in 1996 of OCGA § 19-7-1 (b.1), which concerns custody disputes between legal parents and certain third parties, including prospective adoptive parents."[75] Moreover, in 2001,

---

[71] *In the Interest of Baby Girl Eason*, 257 Ga. at 297 (1).

[72] *Id.*

[73] *Id.*

[74] OCGA § 19-7-1 (b.1) (effective date April 28, 2014) (emphasis supplied).

[75] *In the Interest of B. H.-W.*, 332 Ga. App. at 273 n.2; *see Bowers*, 271 Ga. App. at 271 (relying on *In the Interest of Baby Girl Eason* and holding that an unwed biological father had not abandoned his opportunity interest in a parent-child relationship, and because the relationship between the child and the prospective

the Supreme Court of Georgia clarified that "*Eason* does not stand for the proposition that the fitness test is the substantive standard applicable to every legitimation petition but recognized a continuum of rights, specific to the facts of each case, to which varying standards could be applied."[76] Instead, *Eason* held that

> the parental fitness standard must be used to determine the father's right to legitimate the child because it was the State's action which interfered with the father's rights with respect to the child and which allowed for the development of the parent/child relationship between the child and the adopting parents.[77]

And the *Eason* Court made clear that, "absent the State's involvement and under other circumstances, the best interests of the child standard would be adequate."[78] Here, as in *Eason*, we have a biological father who pursued his opportunity interest in

---

adoptive parents had not developed "in the absence of state participation[,]" the case was remanded solely for a determination of whether the father was a fit parent).

[76] *Davis*, 274 Ga. at 6.

[77] *Id.*

[78] *Id.* at 6-7; s*ee Quilloin*, 434 U.S. at 255 (II) (A) (affirming a decision from the Supreme Court of Georgia and holding that a court can deny a legitimation petition of a fit unwed biological father who has not abandoned his child when the father sought to remove the child from a family unit already in existence with his biological mother and stepfather, and distinguishing cases like this one in which the State places a child "with a new set of parents with whom the child had never before lived").

parenting his biological child, who has been in the custody of prospective adoptive parents since birth, and if the trial court determines on remand that he is a fit parent, his petition must be granted.[79]

For all these reasons, we reverse the trial court's finding that Brumbelow abandoned his opportunity interest in a relationship with E. M., but remand the case for the trial court to determine whether Brumbelow is a fit parent, rather than whether denying his legitimation petition is in E. M.'s best interests. As previously noted, if the trial court concludes that Brumbelow is a fit parent, his legitimation petition must be granted.

*Judgment reversed and case remanded. Doyle, P. J., and Mercier, J., concur.*

---

[79] *See In the Interest of Baby Girl Eason*, 257 Ga. at 296 (1) (holding that if a biological father who sought to legitimate a child who had been placed with prospective adoptive parents has not abandoned his opportunity interest in parenting the child, "the standard which must be used to determine his right to legitimate the child is his fitness as a parent to have custody of the child[,][and] [i]f he is fit he must prevail"); *see supra* note 70.